NOT FOR PUBLICATION

## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF NEW JERSEY
### CAMDEN VICINAGE

```
_____
                              :
GREGORY WILSON,               :
                              :   Civil Action No. 15-0076 (RMB)
              Petitioner,     :
                              :
    v.                        :          OPINION
                              :
JORDAN HOLLINGSWORTH,         :
                              :
              Respondent.     :
_____:_____
```

**BUMB**, District Judge:

This matter comes before the Court upon Petitioner's submission of a pleading titled "Petition for a Habeas Corpus Pursuant to Section 2241," see docket Entry No. 1, at 1, and an application to proceed in forma pauperis. See Docket Entry No. 1-1. The latter consists of Petitioner's affidavit of poverty, see id. at 1-2, and his prison account statement which: (a) shows that Petitioner is housed at the FCI Fort Dix ("Facility"); and (b) contains one hundred entries covering the period from April 14, 2014, to December 18, 2014. See id. at 3-4. Those entries indicate that, during this period, Petitioner's balance was under $100 forty times, between $100 and $200 thirty five times, between $200 and $300 twenty three times, and once at $456.23. See id.

In fact, as recently as on December 4, 2014, Petitioner's available balance was $255.28.  See id. at 3.  Then he executed two large purchases and a few small purchases that reduced the balance from $255.28 to $29.83.  See id.  Once his balance was so reduced, he applied for in forma pauperis status in this matter asserting that he was a pauper.

In his pleading accompanying the aforesaid in forma pauperis application, Petitioner raised challenges to his April 23, 2014, disciplinary charge which ensued from the laboratory test showing that traces of marijuana were detected in Petitioner's urinary sample taken as a result of the Facility's random drug testing program and the particular test conducted on April 14, 2014.  See Docket Entry No. 1, at 1.

Petitioner had a disciplinary hearing on May 15, 2014, and he was found guilty of an illegal use of narcotics.  See id. at 2.  He was sanctioned to 40 days loss of good-conduct time ("GCT") credit and to a series of temporary limitations on his prison privileges (such as his use of email and telephone, various visitation privileges and his opportunity to be housed among the Facility's general prison population).  See id.

While Petitioner maintains that he contested his sanctions administratively, his extensive pleading does not include any facts about the exhaustion process or any references to – or copies of – the documents verifying that such exhaustion took

place, or that he exhausted his challenges before all levels of the Bureau of Prisons ("BOP").  See, generally, Docket Entry No. 1.[1]

While Petitioner's pleading is lengthy and executed in a somewhat circular fashion, it appears that Petitioner raised five claims.  First, he asserted his speculation that his urinary sample might have been mislabeled with another inmate's name and, simultaneously, that other inmate's (or some other inmate's) urinary sample might have been mislabeled with Petitioner's name. See id. at 3-4.[2]

Second, Petitioner asserts that the disciplinary officer might have committed what Petitioner perceived as "fraud" because the final report of Petitioner's disciplinary hearing did not contain the fact that, during his disciplinary hearing,

_____

[1] That defect warrants dismissal of Petitioner's challenges as unexhausted, without prejudice to Petitioner's filing of a written statement establishing proper administrative exhaustion. However, since – as the discussion provided infra illustrates – Petitioner's claims are either jurisdictionally deficient or substantively meritless, a dismissal without prejudice appears unwarranted.  Correspondingly, this Court will presume – without making a factual finding to that effect – that Petitioner duly exhausted his challenges with the warden of the Facility, the Regional Office of the BOP and the agency's Central Office.

[2] Petitioner speculates that such mix-up might have been a result of negligence among prison officials conducting the April 14, 2014, test.  No statement in Petitioner's pleading alleges or even hints at intentional tampering with urinary samples.  See, generally, Docket Entry No. 1.

3

Petitioner made statements detailing his aforesaid speculations about a hypothetical mix-up of urinary samples.  See id. at 4.

Third, Petitioner asserts that his rights were violated because he was not provided with a copy of the laboratory report (finding that there were traces of marijuana in the urinary sample attributed to Petitioner).  See id. at 5.

After raising these three claims, Petitioner turns to an attack on the random drug testing process in general and, toward that end, he asserts that: (a) his Fourth Amendment rights had to be violated by an "illegal search" in the form of that random drug testing; and (b) his "religious rights" were violated because "during the urine sample testing," Petitioner should have had "same sex eyes all over [Petitioner's] private part."  Id.

After that, Petitioner raises his fifth claim which, effectively, attempted to elaborate on his first claim (i.e., the claim that offered a chain of hypothetical speculations that the urinary sample could have been negligently mixed-up).  Cognizant of the speculative nature of that first claim, this fifth claim attempts to buttress it by asserting that Petitioner "intended on calling three witnesses to support the in-security [sic] of the alleged sample and mishandling," id. at 3, because "[t]he witnesses [Petitioner] had requested before the hearing would have testified [as to their own speculations that the urinary samples might have been collected] by the inexperienced prison

4

staff that was new to the job and probably not trained in the collection of urinary samples." Id. at 6.

Correspondingly, Petitioner's fifth claim offers this Court a deducement that his rights were violated by his inability to call those witnesses. See id. In support of this fifth claim, Petitioner provided this Court with four wholly identical pre-printed witness statements, each of which reads:

> 04/14/2014, I, [blank spaces left for the name and ID number] was called to the Lt's office to provide for a random drug analysis. I signed and initiated the sample form, and directed by the collection officer, that was before I provided the urine sample. Once my sample was provided it was not secured with my initiated security tape by me, or in my presence by the correction officer. I was not notified by anyone that any statements pertaining to this matter have been requested had been requested from me for any DHO hearing before.

Id. at 9-12 (the same form filled by inmates Taylor, Webb, Anthony Baumgarten and John Baumgarten) (grammar and punctuation in original).[3]

Petitioner concluded his pleading by stating that he was seeking relief in the form of this Court's order directing either restoration of his lost GCT credit or, in alternative, an order directing DNA testing of the urinary sample attributed to Petitioner. See id. at 7.

---

[3] Petitioner did not specify which three inmates out of the four who executed the pre-printed form (i.e., Webb, Taylor and the Baumgarten brothers) he intended to call as his witnesses.

Petitioner's submission is deficient on numerous grounds.

To start, Petitioner's suitability for in forma pauperis status is, at the very least, dubious.  Section 1914, the filing fee statute, provides, in relevant part, that "the [C]lerk . . . shall require the [plaintiff] . . . to pay a filing fee of $ 350 except [in] a writ of habeas corpus the filing fee shall be $ 5." 28 U.S.C. § 1914(a).  The accompanying provision, Section 1915, governs applications filed in forma pauperis and provides, in relevant part, that leave to proceed in forma pauperis may be granted in any suit to a litigant "who submits an affidavit that includes a statement of all assets such [litigant] possesses [if such affidavit demonstrates] that the [litigant] is unable to pay such fees."  28 U.S.C. § 1915(a)(1); see also Smith v. Bennett, 365 U.S. 708, 712 (1961) ("[W]hile [$5.00] is . . . an 'extremely nominal' sum, if one does not have it . . . the fee might as well be [$5,000]"); Clay v. New York Nat'l Bank, 2001 U.S. Dist. LEXIS 3209, at *1 (S.D.N.Y. Mar. 21, 2001) (same).

Therefore, the grant of in forma pauperis status is trusted to the good faith discretion of the federal judiciary. Reflecting on the same, the Supreme Court clarified that one need not be absolutely destitute to qualify for in forma pauperis status. See Adkins v. E. I. DuPont De Nemours & Co., Inc., 335 U.S. 331 (1948).  In Adkins, the litigant filed a timely motion in district court requesting leave to appeal the district court's

6

decision and stated, in her affidavit, that she was a widow of 74 years of age, that the estimated cost of her record on appeal was $4,000, that all she owned was a house inherited from her husband which had been appraised at a value of $ 3,450, and her only source of income was a small rent from the parts of her home without which she would not be able to purchase even the barest necessities of life, such as food.  The district and appellate courts refused to grant the litigant in forma pauperis status simply because she had not mortgaged her home to raise money toward her litigation, ruling that the litigant had to contribute her last dollar to the cost of litigating the suit.  The Supreme Court disagreed and ruled that a litigant need not be absolutely destitute before allowed to proceed in forma pauperis; rather the litigant has to establish to the satisfaction of the district court's good faith discretion that the payment of the fee would be unduly burdensome in light of the minimal necessities of life unique to that particular litigant.

Where the litigant is an inmate whose minimal necessities of life (such as housing, food, clothes, medical care, etc.) are provided for by the prison authorities and, thus, those needs cannot be left unsatisfied, the court's analysis necessarily factors in those accommodations.  Therefore, the court determines whether the payment of the filing fee, especially if that payment is equal to just a small fraction of the litigant's personal

7

funds, would be too burdensome for the litigant in light of those accommodations.  The District's Rule expressly bars grant of <u>in forma pauperis</u> status to any habeas litigant who has $200 or more on his/her prison account, <u>see</u> Local Civ. R. 81.2(c), while leaving assessments of the scenarios involving less that $200 to the court's discretion.

Here, Petitioner's submission indicates that his prison account is frequently and generously replenished, and he often has over $200 at his disposal (and, sometimes, even over $450).  Indeed, just two weeks prior to his execution of the submission at bar, Petitioner had $255.28 available to him.  Yet, within the following two weeks, he executed a number of purchases that significantly depleted his prison account and, taking advantage of that reduction in funds, commenced the matter at bar.  Now, he claims he is a pauper for whom the expense of $5 would be unduly burdensome.

Petitioner's position is not convincing.  <u>Cf.</u> <u>Thornton v. Micrografx</u>, 878 F. Supp. 931, 938 (N.D. Tex. 1995) ("The court refuses to leave its common sense at the courthouse steps").  A litigant does not become a pauper within the meaning of Section 1915 if he takes advantage of a brief drop in his funds resulting from a series of large spending.  Thus, Petitioner's application to proceed in this matter <u>in forma pauperis</u> will be denied.  Such denial, however, will be without prejudice to establishing

8

Petitioner's suitability for in forma pauperis status in the event Petitioner: (a) files his ninety-day prison account reflecting on his personal funds after December 18, 2014; and (b) that account show a *continuous decline* in funds after December 18, 2014.[4]

In the event Petitioner cannot make such a showing, he would be directed to pay his $5 filing fee within ninety days from the date of entry of the Order accompanying this Opinion.

This Court's finding that Petitioner is not suited for in forma pauperis status, however, does not prevent the Court from addressing Petitioner's pleading on the merits.[5]  Here,

_____

[4]  This Court cannot rule out that Petitioner has recently experienced a substantial change in personal circumstances and, as a result of that change, his private funds stopped being replenished.  In that scenario, the expense of $5 might prove too burdensome to Petitioner.

[5]  While civil complaints are merely received and cannot be deemed "filed" until and unless the litigant prepay his filing fee or duly obtains in forma pauperis status, see 28 U.S.C. § 1915, and the court cannot reach the merits of the litigant's civil claims without first resolving the in forma pauperis issue, see Izquierdo v. State, 2013 U.S. App. LEXIS 15533, at *2-3 and n.1 (3d Cir. July 25, 2013), habeas applications are deemed "filed" upon receipt, see Brown v. Grondolsky, 2009 U.S. Dist. LEXIS 103111, at *2 (D.N.J. Nov. 5, 2009) (citing to the order stating, "The revised Habeas Rule 3(b) requires the Clerk to file a petition, even though it may otherwise fail to comply with Habeas Rule 2.  The Rule is not limited to those instances where the petition is defective only in form; the Clerk is also required to file the petition even though it lacks the required filing fee or an in forma pauperis form) (quoting 28 U.S.C. § 2254, Rule 3, Advisory Committee Notes, 2004 Am., brackets and ellipses omitted); accord Santana v. United States, 98 F. 3d 752 (3d Cir. 1996), therefore enabling the court to address the

Petitioner raised a potpourri of claims that "mix apples and oranges, and many other fruits as well."  <u>McKnight v. United States</u>, 2014 U.S. Dist. LEXIS 86164, at *36 (D.N.J. June 25, 2014) (citation omitted).  For instance, Petitioner's illegal search and "religious rights" claims are not cognizable in habeas review.  At most, those allegations could be construed as civil rights challenges.

Federal law provides two avenues of relief to prisoners: a petition for habeas corpus and a civil rights complaint.  <u>See Muhammad v. Close</u>, 540 U.S. 749, 750(2004).  "Challenges to the validity of any confinement or to particulars affecting its duration are the province of habeas corpus . . . [while] requests for relief turning on circumstances of confinement [fall within the realm of] a § 1983 action {or it's federal counterpart}."[6]  <u>Id.</u>; <u>see also</u> <u>Preiser v. Rodriguez</u>, 411 U.S. 475 (1973).  The

---

merits of the litigant's habeas claims, even if the court requires the litigant's later payment of filing fee or submission of a viable <u>in forma pauperis</u> application after screening on the merits.  <u>See</u> Local Civil Rule 81.2(b).

[6] As § 1983 action applies only to state actions, it is not available to federal prisoners; the federal counterpart is an action under Bivens alleging deprivation of a constitutional right.  <u>See</u> <u>Brown v. Philip Morris, Inc.</u>, 250 F.3d 789, 801 (3d Cir. 2001) ("A Bivens action . . . is the federal equivalent of the § 1983 cause of action against state actors, [it] will lie where the defendant has violated the plaintiff's rights under color of federal law").

Court of Appeals explained the distinction between civil rights
relief and habeas relief as follows:

> [W]henever the challenge ultimately attacks the "core
> of habeas" – the validity of the continued conviction
> or the fact or length of the sentence – a challenge,
> however denominated and regardless of the relief
> sought, must be brought by way of a habeas corpus
> petition.  Conversely, when the challenge is to a
> condition of confinement such that a finding in
> plaintiff's favor would not alter his sentence or undo
> his conviction, an action under § 1983 is appropriate.

Leamer v. Fauver, 288 F.3d 532, 542 (3d Cir. 2002).

Therefore, a prisoner is entitled to a writ of habeas corpus
only to the degree he "seek[s] to invalidate the duration of
[his] confinement – either directly through an injunction
compelling speedier release or indirectly through a judicial
determination that necessarily implies the unlawfulness of the
[government's] custody."  See Wilkinson v. Dotson, 544 U.S. 74,
81 (2005).  That is why Petitioner may challenge the execution of
his sentence – in terms of his loss of GCT credit – in this §
2241 action.  See Woodall v. Fed. Bureau of Prisons, 432 F.3d
235, 243 (3d Cir. 2005).  However, "this does not make [this] §
2241 actions like [a] 'conditions of confinement' lawsuit[],
which [should be] brought under civil rights laws."  McIntosh v.
U.S. Parole Comm'n, 115 F.3d 809, 811-12 (10th Cir. 1997)
(internal citation omitted); see also Preiser, 411 U.S. at 500.

Correspondingly, even if Petitioner believes, in good faith,
that he was illegally searched by being required to partake in

11

the facility's random urinary testing program, or if he actually holds sincere religious beliefs pursuant to which his "private part" must be observed "all over" by "same sex eyes" while Petitioner urinates, the proper avenue for asserting such conditions of confinement claims is a suit pursuant to Bivens v. Six Unknown Named Agents of the Fed. Bur. of Narcotics, 403 U.S. 388 (1971), not the instant Section 2241 habeas matter. Therefore, all Petitioner's challenges unrelated to his loss of GCT credit will be dismissed for lack of jurisdiction without prejudice to raising those claims in a Bivens matter.[7]

Next, Petitioner's request for this Court's order directing either outright restoration of his GCT credit or a DNA testing of the urinary sample attributed to Petitioner indicates his misunderstanding of the scope and nature of § 2241 review.  See Mitts v. Zickefoose, 869 F. Supp. 2d 568 (D.N.J. 2012).  The Mitts court clarified that the proper remedy with regard to a successful claim asserting an unconstitutional loss of GCT credit was an order directing a bona fide curative hearing free of the procedural errors that tainted the original hearing (and an order directing restoration of GCT credit was an inappropriate remedy unless the inmate was denied a bona fide curative hearing).  See

---

[7]   No statement in this Opinion or accompanying Order shall be construed as this Court's finding that Petitioner's civil rights challenges are procedurally proper (or improper) or that they are substantively meritorious (or meritless).

id. at 575; see also Cannon v. Schultz, 2010 U.S. Dist. LEXIS
59468, at *30 (D.N.J. June 16, 2010).  Thus, the remedy
Petitioner could have obtained had he established a
constitutional defect of his disciplinary hearing would be a
curative hearing, not a restoration of his lost GCT credit or an
order directing DNA testing of the urinary sample attributed to
Petitioner.

Furthermore, Petitioner's position (that his due process
rights were violated by the procedures of his May 15, 2014,
hearing or by the findings made as a result of that hearing) is
facially meritless and, thus, cannot warrant a curative hearing.
Convicted and sentenced prisoners retain the protections of the
Due Process Clause of the Fifth and Fourteenth Amendments that
the government may not deprive them of life, liberty, or property
without due process of law.  See Wolff v. McDonnell, 418 U.S.
539, 556 (1974); Haines v. Kerner, 404 U.S. 519 (1972).  Such
protections are, however, "subject to restrictions imposed by the
nature of the regime to which [prisoners] have been lawfully
committed."  Wolff, 418 U.S. at 556.

A liberty interest protected by the Due Process Clause may
arise from either of two sources: the Due Process Clause itself
or from state or federal law.  See Hewitt v. Helms, 459 U.S. 460,
466 (1983); Asquith v. Dep't of Corr., 186 F.3d 407, 409 (3d Cir.
1999).  Where the government has created a right to GCT credits,

13

and has recognized that a prisoner's misconduct authorizes deprivation of the right to such credits as a sanction, the prisoner is entitled to a hearing by an impartial disciplinary tribunal, see Wolff, 418 U.S. at 570-71, i.e., by an officer excluding "only those [prison] officials who have a direct personal or otherwise substantial involvement . . . in the circumstances underlying the charge." Meyers v. Alldredge, 492 F.2d 296, 306 (3d Cir. 1974).

Within the setting of an administrative hearing, the due process guarantees have two arms, one "quasi-procedural" and the other "quasi-substantive." Mitts, 869 F. Supp. 2d at 575.  To comply with the quasi-procedural arm, prison officials must provide a prisoner facing sanctions with: (1) a written notice of the charges at least 24 hours prior to his hearing; (2) an opportunity to call witnesses and presented documentary evidence in his defense unless it is unduly hazardous to institutional safety/correctional goals; and (3) a written statement as to the evidence relied on and the reasons for the disciplinary action. See Wolff, 418 U.S. at 564-66.[8]

---

[8]  Consequently, prisoners do not have a due process right of confrontation and cross-examination, or a right to counsel, in prison disciplinary proceedings.  See Wolff, 418 U.S. at 569-70. A fortiori, prisoners do not have the right to production of laboratory reports underlying the charges of which prisoners are duly informed, or to DNA testing of disputed evidence, etc.

On its quasi-substantive side, the due process requires that findings of a prison disciplinary official be supported by "some evidence" in the record.  See Superintendent, Massachusetts Correctional Institution at Wolpole v. Hill, 472 U.S. 445, 454-56 (1985).

Ascertaining whether the "some evidence" standard is satisfied "does not require examination of the entire record, independent assessment of the credibility of witnesses, or weighing of the evidence."  Id. 455.  "Instead, the relevant question is whether there is *any* evidence in the record that could support the conclusion reached by the disciplinary board."  Id. at 455-56 (emphasis supplied).[9]

The quasi-procedural and quasi-substantive aspects are not isolated from each other: that must be read in conjunction.  To illustrate, if an inmate charged with a disciplinary infraction on the basis of certain evidence is able to offer the hearing

---

[9]  Hence, neither the "beyond a reasonable doubt" nor even the "preponderance of evidence" standard is applicable to a prison hearing.  See, e.g., Hairston v. Heffron, 2010 U.S. Dist. LEXIS 134999, at *13 (D.N.J. Dec. 21, 2010) ("there is no question that the 'some evidence' standard is less exacting than the preponderance of the evidence standard: it merely requires that the decision not be arbitrary or not without any support in the record") (citing Gaither v. Anderson, 236 F.3d 817, 819 (7th Cir. 2000); Brown v. Fauver, 819 F.2d 395 (3d Cir. 1987); Gibbs v. King, 779 F.2d 1040, 1044 (5th Cir. 1986)); McCauley v. Williamson, 2006 U.S. Dist. LEXIS 77182 (M.D. Pa. Aug. 18, 2006) (dismissing a petitioner's claim that his hearing should have been conducted with a higher degree of evidentiary precision).

officer the testimony of a witness who can establishing that the evidence is *entirely false*, then the denial of an opportunity to call such a witness would amount to a violation of the inmate's rights: this is because – had the hearing officer been presented with such a testimony – (s)he would not be able to find, in good faith, that there was "some evidence" showing that the inmate committed the charged infraction.[10]  In contrast, if the inmate desires to call witnesses whose testimonies are irrelevant or inapposite to the evidence at issue, or if those testimonies cannot establish the falsity of that evidence, then the inmate's due process rights are not infringed by a denial of the opportunity to call those witnesses: this is so because such testimonies, even if offered, would not render the finding that the inmate committed the charged infraction invalid – the charge and the resulting sanction would remain based on "some evidence."

    Here, this Court is presented with the latter scenario, *i.e.*, the scenario where the testimony Petitioner allegedly desired to offer could not possibly establish that the urinary

---

[10]   In other words, under Wolff and Hill, if the inmate is not informed of the charge (and, hence does not know what to contest or with regard to which issue (s)he should call his/her witnesses) or if the inmate is dened an opportunity to call the witness (who can establish complete falsity of the evidence underlying the charge), or if the inmate is not served with the disciplinary report (informing him/her that (s)he would be disciplined on the basis of the evidence his/her witness could have established to be completely false), then that inmate's due process rights are violated.

16

sample attributed to Petitioner was taken from some other inmate (and, thus, such testimony could not establish that Petitioner was charged with the infraction he did not commit, and that his sanction was without "some evidence" in support).

Here, Petitioner appears well aware of the "some evidence" standard and the low threshold of proof required for upholding a disciplinary finding.  See Docket Entry No. 1, at 2-4 (detailing the "some evidence" test and citing Thompson v. Owens, 889 F.2d 500 (3d Cir. 1989), the governing Circuit law).[11]

In Thompson, the inmate who, just like Petitioner, "tested positive on his urinalysis drug test and was [disciplined for the] misconduct" of illegal use of narcotics, asserted that the laboratory test results of his urinary sample should not have been introduced and relied upon during his disciplinary hearing because "there was no evidence of the chain of custody of his urine sample."  Thompson, 889 F.2d at 501.[12]

_____

[11]   Thompson was a civil rights action, not a habeas matter. However, that distinction is not relevant for the purposes of this Court's analysis since the due process test applied in Thompson equally governs habeas and civil rights actions.

[12]   In other words, just like Petitioner, the inmate in Thompson speculated that his urinary sample might have been negligently mishandled and demanded proof, in the form of the chain of custody, that the sample he produced was duly attributed to him prior to testing and, upon testing, the test results were of his sample.

Nothing that "[t]he quantum of evidence necessary in the context of prisoner disciplinary proceedings" was merely "some evidence," and the inmate did not "allege [any facts showing] that prison officials tampered with the samples [or] that the prison officials failed to follow their own procedures [and] merely argue[d] that [the lack of proof of] a complete chain of custody . . . must [render the laboratory test results] unreliable," the Thompson Court dismissed the inmate's due process challenges.

Having no facts showing that the Facility officials tampered with the urinary samples collected on April 14, 2014, see, generally, Docket Entry No. 1, Petitioner cannot distinguish his case from Thompson.   However, hoping to escape the reach of Thompson, he quotes Judge Leon Higginbotham, Jr.'s concurrence, which observed:

> Common sense and a concern for fairness are the
> prerequisites for any rational administrative process.
> Our common experience teaches us that through mere
> negligence administrative errors can occur in the
> processing of files or samples; such errors can occur
> without any intent to tamper or to create erroneous
> results.

Docket Entry No. 1, at 4-5 (quoting Thompson, 889 F.2d at 502).

Relying on that observation, Petitioner maintains that Thompson should be read as implicitly allowing for a finding of due process violation where the litigant offers the court his/her mere self-serving speculations that the processes of sample

18

collection and testing might have been, hypothetically, marred by prison officers' negligence.  Petitioner misreads both the holding of Thompson and Judge Higginbotham's concurrence.  The majority in Thompson expressly stated:

> The due process requirements in this context are minimal, and they are met here.  Positive urinalysis results based on samples that *officials claim to be appellant's* constitute some evidence of appellant's drug use.  A [court's inquiry into the] chain of custody . . . would be nothing more or less than an "independent assessment" into the reliability of the evidence, and Hill tells us, explicitly, that such a "credibility" determination is not required [in order to affirm the hearing officer's determination that an infraction was committed and had to be sanctioned].

Thompson, 889 F.2d at 502.

Hence, under the unambiguous holding of Thompson, the disciplinary officer's finding (that the urinary sample attributed to Petitioner was indeed Petitioner's) renders the issue: (a) conclusively resolved for the purposes of this Court's factual review; and (b) not open to this Court's investigation or second-guessing.  See id.

Here, Petitioner was not sanctioned in complete void of evidence; in fact, he was sanctioned on the basis of solid evidence ensuing from the laboratory report finding that the urinary sample attributed to Petitioner contained traces of marijuana.  The four identical pre-printed forms filled by Webb, Taylor and the Baumgartens, even if construed as their affidavits and taken as true, would not be able to transform that evidence

19

into "completely no evidence."  Those affidavits merely state
that Webb, Taylor and the Baumgartens' samples were collected
after these inmates signed their sample forms, and that Webb,
Taylor and the Baumgartens did not attach the identification
tapes to their samples.  <u>See</u> Docket Entry No. 1, at 9-12.
Nothing in those affidavits offers this Court a shred of a fact
showing that the officers mislabeled or mishandled the collected
samples (either of Petitioner or those of Webb, Taylor and the
Baumgartens) or that the officers attached wrong identification
tapes to those samples.  Moreover, these affidavits do not even
offer this Court any facts establishing negligence: they merely
invite this Court to find the *possibility* of negligence.  <u>See</u> <u>id.</u>

Indeed, even Petitioner's own allegations are laden with the
statements that negligence on the part of officers was merely
"possible," not actually present.  <u>See</u>, <u>generally</u>, Docket Entry
No. 1.  In sum, Petitioner invites this Court to find that his
sanction violated his constitutional rights simply because
Petitioner and other inmates at the Facility prefer to self-
servingly speculate about the errors the officers *might* have
committed.  That this Court cannot do.  Petitioner's assertions
are unavailing because self-serving speculations built upon a
chain of self-serving assumptions cannot sustain finding a
liability.  <u>See Salyer Land Co. v. Tulare Lake Basin Water</u>
<u>Storage Dist.</u>, 410 U.S. 719, 731, 93 S. Ct. 1224, 35 L. Ed. 2d

659 (1973) ("[A]djudication cannot rest on [a] 'house that Jack built' foundation").

Here, Petitioner was duly informed of the charge against him and the findings of the disciplinary officer.  Those finding were unquestionably supported by "some evidence."  And while Petitioner maintains that he was denied an opportunity to call witnesses, such denial – even if it is presumed true – could not have resulted in a violation of Petitioner's due process rights because the witnesses' testimony – even if they were allowed – would not have altered the disciplinary officer's finding that the charge against Petitioner was supported by "some evidence." Analogously, Petitioner's due process rights could not have been violated by a lack of access to the laboratory report simply because nothing in <u>Wolff</u> entitled his to that report.

In sum, no matter how this Court were to slice it, Petitioner's habeas attack on his loss of GCT credit fails to state a claim suggesting that his rights were violated.  And, since Petitioner's submission at bar is as detailed as it is lengthy, it is apparent that leave to replead Petitioner's GCT-credit challenges would be futile.  Correspondingly, Petitioner's GCT-credit-based habeas challenges will be dismissed for failure to show a violation of his federal rights.  Petitioner's remaining claims will be dismissed for lack of jurisdiction, and

he will be directed to either properly establish his status as a pauper or prepay his $5 filing fee.


An appropriate Order follows.

s/Renée Marie Bumb

**RENÉE MARIE BUMB**
**United States District Judge**

Dated: January 23, 2015